**Lawny Lamar BROWNING,
et al., Plaintiffs,**

v.

**Richard VERNON, et al., Defendants.**

**Civ. No. 91–0409–S–HLR.**

United States District Court,
D. Idaho.

Sept. 30, 1994.

Gar Hackney, Lynn Scott Hackney & Sullivan, Boise, ID, Katharine K. Nanda, Stephen L. Pevar, American Civil Liberties Union, Denver, CO, for plaintiffs.

Timothy D. Wilson, Deputy Atty. Gen., Dept. of Corrections, Boise, ID, for defendants.

**ORDER ADOPTING REPORT AND RECOMMENDATION, VACATING TRIAL AND ADMINISTRATIVELY TERMINATING CASE**

RYAN, Senior District Judge.

## I. INTRODUCTION

All pretrial matters in the above-entitled class action were referred to United States Magistrate Judge Mikel H. Williams. Plaintiffs filed a motion for summary judgment on February 22, 1994, seeking a declaration that they were denied rights guaranteed to them under the Due Process Clause of the Fourteenth Amendment. Specifically, plaintiffs ask the court to declare that defendants failed to provide adequate notice and meaningful opportunities to be heard in connection with the rider program at NICI as required by Idaho Code § 19–2601.

On June 16, 1994, Magistrate Judge Williams filed a Report and Recommendation in which he recommends the following disposition of Plaintiffs' Motion for Summary Judgment: (1) that plaintiffs' motion be granted to the extent it seeks a ruling that the defendants must provide written regulations governing the operation of the rider program; (2) that defendants be given sixty days to produce written regulations that comply with the statements made in the Report and Recommendation; (3) that counsel for both parties meet during this sixty-day period and attempt to reach an agreement on the contents of the regulations; and (4) that at the end of the sixty-day period, the parties submit to the court a set of the agreed-upon written regulations for approval.

Magistrate Judge Williams also recommends that plaintiffs' request for a declaratory judgment that past practices of the NICI violate due process, and for an injunction against those practices, be granted in part and denied in part. Ultimately, Magistrate Judge Williams recommends that plaintiffs' motion should be granted as to the following five practices, and denied as to the remainder:

1. Failing to notify the rider in writing, prior to April 1991, on the Form 022 or its equivalent of the rider's right to present witnesses at his rebuttal hearing.

2. Failing to provide copies of the staff evaluations to riders.

3. Failing to provide sex offender or other riders with a copy of their psychological report.

4. Failing to provide a means for segregated riders to prepare for the rebuttal hearing, i.e., providing staff assistance to contact witnesses, access to a telephone to contact legal counsel.

5. Failing to give segregated riders more than twenty-four hours to prepare for the rebuttal hearing.

Report and Recommendation, filed June 16, 1994, at 27–28.

Plaintiffs' Partial Objection to Magistrate's Report and Recommendation was filed on July 5, 1994. After receiving an extension of time, defendants filed their Objection to Report and Recommendation on August 4, 1994. Thereafter, plaintiffs filed their Reply to Defendants' Objection to the Magistrate's Report on August 17, 1994. Accordingly, pursuant to 28 U.S.C. § 636(b)–(1), this court is required to engage in a de novo review of the record.

## II. DISCUSSION

### A. Plaintiffs' Partial Objection

Essentially, plaintiffs object to Magistrate Judge Williams' recommendation on the following basis: "The Magistrate's Report and Recommendation deserves to be adopted by this Court in all respects except one. While the Report finds six constitutional violations, it provides insufficient redress for them. Indeed, the limited remedy *suggested* by the Magistrate could render his entire Report a hollow victory." Plaintiffs' Partial Objection, filed July 5, 1994, at 2 n. 1 (emphasis added).

To the extent Magistrate Judge Williams "suggested" that plaintiffs must prove actual prejudice before they may obtain new hearings, such a suggestion was merely dicta, and is not binding on any members of the plaintiff class. Indeed, by way of post conviction proceedings, it will be up to the state courts of Idaho to determine appropriate remedies for the constitutional violations that occurred

at NICI. Accordingly, although plaintiffs' partial objection in this regard is compelling, this court will not delve into the merits of plaintiffs' arguments.

Also included within their partial objection, plaintiffs note that, although the report recommends that their motion be denied in part and granted in part, "the Report does not indicate anything that was denied." Plaintiffs' Partial Objection, at 2 n. 1. More specifically, plaintiffs state:

> The Report concludes with an itemized list of five of the six remedies plaintiffs requested, but the only one missing—the right to an impartial hearing examiner—is mandated in an earlier portion of the Report [at page 21]. Plaintiffs are not trying to read more into the Report than exists, but it certainly appears that the Magistrate upholds plaintiffs' arguments on all six issues presented.

*Id.*

The court has fully reviewed the record with respect to this issue, and finds that plaintiffs' point is well taken. Plaintiffs' entitlement to an impartial hearing examiner should have been added to the practices delineated at the end of the magistrate judge's report. Accordingly, to the extent that issue was omitted from the magistrate judge's ultimate conclusion, the Report and Recommendation warrants modification by this court.

### B. *Defendants' Objections*

The court has reviewed defendants' objections to Magistrate Judge Williams' Report and Recommendation, together with plaintiffs' reply thereto. Based on this review, and the record as a whole, the court does not find any of defendants' objections to be well taken. Therefore, rather than engaging in a lengthy discussion of defendants' objections, and because the court finds Magistrate Williams' Report and Recommendation to be thorough, well reasoned, and well supported in the law, aside from the one modification discussed in the preceding section, the Re-

port and Recommendation shall be incorporated by reference and adopted in its entirety.

### C. *Motion to Vacate and Order of Administrative Termination*

On September 26, 1994, defendants filed a Motion to Vacate Hearing,[1] asking the court to vacate the trial date of November 1, 1994, in light of the interlocutory appeal that has been filed in this matter. The court has also received a letter from plaintiffs' counsel, dated September 29, 1994, asking that the present trial date be vacated.

Having considered the requests from counsel, and the record as a whole, the court finds that, pending resolution of the interlocutory appeal before the Ninth Circuit Court of Appeals, the November 1, 1994, trial date should be vacated. In addition, although the order set forth below contemplates further review to be conducted by Magistrate Judge Williams, the court finds the case appropriate for administrative termination at this time.

### III. ORDER

Based upon the foregoing and the court being fully advised in the premises,

IT IS HEREBY ORDERED that the Report and Recommendation filed on June 16, 1994, should be and is hereby INCORPORATED by reference, ADOPTED in its entirety and MODIFIED to the extent that, rather than indicating that Plaintiffs' Motion for Summary Judgment should be granted in part and denied in part, the report shall be considered to: (1) include the recommendation that Plaintiffs' Motion for Summary Judgment should be granted in its entirety; and (2) include plaintiffs' entitlement to an impartial hearing examiner among those practices enumerated at pages 27 and 28 of the report.

IT IS FURTHER ORDERED that Plaintiffs' Motion for Summary Judgment, filed February 22, 1994, should be, and is hereby,

---

1. In their motion, defendants incorrectly state that this matter is set for trial before Magistrate Judge Mikel H. Williams. Although all pretrial matters have been referred to Magistrate Judge Williams, the parties have not consented to pro-

ceed before the magistrate for all purposes. Therefore, unless the parties choose to execute a consent form, should this case ultimately proceed to trial, a district judge will preside.

GRANTED. Plaintiffs were not afforded their rights under the Due Process Clause of the Fourteenth Amendment, and therefore:

(1) defendants shall provide written regulations governing the operation of the rider program;

(2) within sixty days of this order, defendants shall produce written regulations that comply with the requirements set forth in the Report and Recommendation;

(3) counsel for both parties shall meet during this sixty-day period and attempt to reach an agreement on the contents of the regulations; and

(4) at the end of the sixty-day period, the parties shall submit to the court a set of the agreed-upon written regulations for review and approval by United States Magistrate Judge Mikel H. Williams.

IT IS FURTHER ORDERED that defendants' Motion to Vacate Hearing filed on September 26, 1994, should be, and is hereby, GRANTED; and the trial currently set ·on November 1, 1994, should be, and is hereby, VACATED pending resolution of the interlocutory appeal before the Ninth Circuit Court of Appeals.

IT IS FURTHER ORDERED that the Clerk of Court shall ADMINISTRATIVELY TERMINATE the above-entitled action in his records, without prejudice to the right of the parties to reopen this proceeding for good cause shown or for the entry of any stipulation or order, or for any other purpose required to obtain a final determination of this litigation.

## REPORT AND RECOMMENDATION

WILLIAMS, United States Magistrate Judge.

### INTRODUCTION

This case is before this Court pursuant to Judge Harold L. Ryan's Order of Reference entered September 25, 1991, which refers all pretrial matters to this Court. Currently before the Court is Plaintiffs' Motion for Summary Judgment (Dkt. # 75). Briefing on the motion is now complete, and the Court heard oral argument on April 18, 1994.

## REPORT

### I. Background Facts

The Plaintiffs are a class of inmates incarcerated at the North Idaho Correctional Institution (NICI). These inmates—known as "riders"—were sentenced under Idaho Code § 19–2601(4) which allows the sentencing judge to retain jurisdiction to re-evaluate the riders' potential for probation during the first 120 days of the sentence. Near the end of a particular rider's 120–day period, a report evaluating that rider's potential for probation is submitted to the sentencing judge. The Plaintiffs claim that they have a due process right to a fair and accurate report, and that NICI policies denied them this right.

An earlier Report and Recommendation by this Court, filed February 19, 1993 (Dkt. # 48), and adopted by Judge Ryan on July 22, 1993 (Dkt. # 56), established that the Plaintiffs had a liberty interest in a fair and accurate report. The issue presented now by Plaintiffs' motion concerns what process is due to protect that liberty interest.

The Defendants assert that this issue cannot be resolved on summary judgment. The Defendants point to numerous conflicts between their affidavits and Plaintiffs' affidavits concerning the operation of the rider program.

The Court has examined the record thoroughly to determine whether genuine issues of material fact remain to be tried. Specifically, the Court has compared Plaintiffs' Statement of Uncontested Facts (Dkt. # 77) with Defendants' Statement of Contested Facts (Dkt. # 85), and the affidavits and other documents filed in connection with those statements. From that comparison, some undisputed facts emerge, while other "facts" remain contested. The Court will discuss these contested and uncontested facts in detail after giving a brief overview of the rider program and the class certification order.

### A. Rider Program Overview:

An inmate is sentenced to a "120–day rider" at the NICI to determine if he is a good candidate for probation. The rider is then

watched and evaluated by the NICI staff. After approximately three months, staff evaluations are reviewed by the Jurisdictional Review Committee (JRC) outside the presence of the rider. The JRC is a three-member panel made up of NICI staff. The JRC then makes a tentative recommendation as to whether the sentencing judge should retain jurisdiction to place the rider on probation, or drop jurisdiction so that the rider would begin serving his sentence of incarceration.

To notify the rider of the JRC's tentative recommendation, the Defendants used a document known as "Form 022" that included six blank lines where NICI staff could summarize the tentative recommendation in handwriting. The staff evaluations were on separate sheets of paper and accompanied Form 022.

If the recommendation was to drop jurisdiction, the rider was immediately placed in administrative segregation where he could not have any contact with other inmates. A hearing—known as a rebuttal hearing—would then be held where the rider could confront the JRC and rebut the tentative recommendation. At the conclusion of the rebuttal hearing, the JRC would then prepare a final report and recommendation which would be sent to the sentencing judge.

## B. Class Certification:

Pursuant to an order signed September 30, 1992, this matter has been certified as a class action with the class consisting of

all present and future inmates committed to the custody of the Idaho Department of Correction who had (or will have) jurisdiction retained pursuant to Idaho Code § 19–2601(4) by the sentencing court, who were (or will be) housed at the North Idaho Correctional Institution during the period of retained jurisdiction, and who had (or will have) a recommendation from the NICI Jurisdictional Review Committee for relinquishment of jurisdiction by the sentencing court.

## II. Statement of Contested and Uncontested Facts

The Court will now discuss the operation of the rider program in more detail, setting forth both the contested and uncontested facts. The Court will discuss each major aspect of the rider program that has been challenged by the Plaintiffs.

### A. Written Regulations:

It is undisputed that the Defendants never had written guidelines setting standards for such crucial aspects of the rider program as the notice of the rebuttal hearing, the rider's right to call witnesses and present a case, the operation of the rebuttal hearing itself, and the JRC's deliberative process.

### B. Time to Prepare:

Plaintiffs have filed the affidavits of many riders who assert that they were given less than twenty-four hours to prepare for their rebuttal hearing. These riders assert that they were first told of the tentative recommendation of the JRC less than twenty-four hours before their rebuttal hearing, and were not informed that they could seek additional time.

The Defendants dispute this with their own affidavits stating that a rider was given at least twenty-four hours to prepare unless the rider wanted his hearing sooner. The Defendants further assert that at the time of the JRC hearing, each rider was asked if he needed additional time to prepare.

### C. Segregation:

It is undisputed that every rider who received a tentative pre-hearing evaluation that recommended a denial of probation was automatically placed in a segregated unit and not allowed to personally contact potential witnesses. See Affidavit of Yeoman, ¶ 18 at p. 3, attached to Defendants' State of Contested Facts (Dkt. # 85).

### D. Preparation for the Hearing and the Opportunity to Call Witnesses:

The Affidavit of Terry Cummings (Tab B–18 of Appendix attached to Plaintiffs' Brief (Dkt. # 79)) establishes that commencing in January 1992, staff representatives started to be routinely assigned to riders in segregation. The Defendants assert that prior to that time, staff assistance was given to the segregated riders who specifically requested it. Many of the riders, however, deny receiv-

ing requested assistance, while other riders complain that the "assistance" was reluctant and unreliable.

Many of the segregated riders also complain that they were never advised of their right to call witnesses at the rebuttal hearing. It is undisputed that for a time, Form 022 did not contain a notification of the riders' right to call witnesses. *See* Affidavit of Allen, ¶ 37 at p. 4. Nevertheless, the Defendants have filed affidavits indicating that they routinely advised the riders orally of their right to call witnesses, even if it was not always done in writing.

While the riders paint a bleak picture of almost total denial, the Defendants assert that the record shows the riders regularly offering both live and written testimony from witnesses at their rebuttal hearing. For example, rider Samuel William Miller filed his Affidavit stating that the JRC refused to call four of the individuals Miller wanted as witnesses. Miller goes on to detail how those four witnesses could have helped him if they had been allowed to testify. *See* Appendix to Plaintiffs' Brief filed February 22, 1994, at Tab A–8. Later, Miller asserts that "[o]ut of the total number of ten witnesses who I requested, zero were allowed to testify." *Id.*

While Miller paints a vivid portrait of due process violations, his bright hues begin to run somewhat under the light. The file on Miller's JRC hearing shows that all four individuals he claims were not allowed to testify did file written statements containing the very information Miller claims he was blocked from presenting. In fact, nine written witness statements were examined by the JRC on Miller's behalf. The record shows that when Miller was asked whether his witness statements were satisfactory, he responded, "[y]es, my witness statements are satisfactory." *See* Appendix A attached to Affidavit of Sheryl Westhoff at Tab 3, p. 3.

As a second example, rider Robert January—a sex offender—requested four witnesses. One witness was unavailable, but two others testified on January's behalf at the hearing, including David Holloway, the staff psychologist who prepared January's psychological evaluation. The fourth witness submitted a detailed written statement to the JRC. *Id.* at Tab 27.

These two examples are illustrative of the other riders whose cases are well-documented in the record. It is very difficult to tell from this record whether the riders were actually denied an opportunity to present their case at the rebuttal hearing. This discussion is only for the purpose of putting the claims in context, because Plaintiffs do not request in this suit a finding that any individual rider suffered actual constitutional injury. The Court will discuss this issue in greater detail in Part V of this Report and Recommendation.

### E. *Phone Calls from Segregation:*

It is undisputed that until sometime in 1992, segregated riders did not have the ability or opportunity to make phone calls from the segregated unit. *See* Affidavit of Allen, ¶ 25 at p. 3. The segregated unit now has a phone that may be used by the segregated riders.

### F. *Staff Evaluations:*

It is undisputed that up until sometime in 1992, segregated riders were not given copies of the staff evaluations accompanying the Form 022.[1] There are, however, three main disputes over other matters.

The riders assert they (1) were not given a copy of Form 022 prior to 1992, (2) were not allowed to take notes while reading the documents, and (3) were given only fifteen minutes or so to memorize all the documents. The defendants counter that Form 022 was given to the riders and that they "were encouraged to take notes" and "given considerably more than fifteen minutes to read those documents and were not expected to memorize them." *See* Defendants' Statement of Contested Facts at p. 9.

---

1. Since 1992, it is undisputed that the riders have been provided with a copy of Form 022 and the staff evaluations. The system has changed recently: Instead of preparing a one-time evaluation just prior to the JRC hearing, the staff now keeps a running chronological log of evaluation entries, a copy of which is presented to the rider.

### G. Sex Offenders:

It is undisputed that each sex offender rider would be evaluated by a staff psychologist, and a written psychological evaluation would be provided to the JRC. It is undisputed that the rider has never been permitted to see this psychological report. Since about 1981, the psychologist would discuss the report with the rider, and since the Fall of 1992, the rider does receive a written summary of the report. But the report itself goes directly to the JRC and has never been made available to the rider.

In addition, there is a dispute over the sex offender's right to call the psychologist as a witness. Defendants claim that this is permitted while Plaintiffs assert that they have never been given that right.[2]

### H. Training of Officers:

The Plaintiffs have filed affidavits and deposition testimony indicating that NICI staff receive little or no training on how to prepare written evaluations of the riders. In addition, Plaintiffs assert that there was a "publish or perish" policy at NICI that required a certain number of evaluations from each staff member, compelling them to fabricate evaluations to meet unrealistic quotas.

The Defendants countered that there is training on evaluations given at the Department of Corrections Training Academy, through which all staff pass before they begin work. In addition, Defendants assert that staff are given a "copy of performance criteria for inmate performance evaluation comments at the time they arrive at NICI." Defendants' Statement of Contested Facts at ¶ 17, p. 13. In addition, Defendants assert that supervisors monitored the evaluations prepared by the staff, and that any fabricated evaluations were the product of a few staffers no longer employed at the NICI.

### I. JRC Decision–Making Process:

Plaintiffs filed deposition testimony of an NICI staffer indicating that "[i]t was very easy to go ahead and walk in while [JRC committee members] were making decisions and make verbal comments ... that often swayed the committee." *See* Deposition of

Werline, Plaintiffs' Appendix at Tab B–20, at pp. 18–19. In response, Defendants filed affidavits of JRC members denying that any ex-parte communications were accepted by the JRC or used in any way during its deliberations.

The parties have further disputes about the objectivity of the JRC process. The Plaintiffs filed twelve affidavits of riders who said that their counselor was one of the members of their JRC, thereby raising the possibility that the counselor may have some bias against the rider formed from prior contact. This bias would be difficult for the rider to identify and rebut since it was based on prior contact, not on information before the JRC available to all parties. The Defendants responded that "it has been the practice of the [JRC] that if any committee member believes for any reason they had formed an undue bias they could remove themselves as a member of the committee." Defendants' Statement of Contested Facts as ¶ 41, p. 28.

### III. Legal Standards

### A. Summary Judgment:

This Court must determine, viewing the evidence in a light most favorable to the nonmoving party, whether there are any genuine issues of material fact. Fed.R.Civ.P. 56(c); *Del Monte Dunes Ltd. v. Monterey*, 920 F.2d 1496 (9th Cir.1990).

### B. Due Process Analysis:

■ To determine what process is due to protect the rider's liberty interest in a fair and accurate JRC recommendation, the Court is guided by *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976):

> More precisely, our prior decisions indicate that identification of the specific dictates of due process generally requires consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function in-

---

**2.** As noted on page 7, at the rebuttal hearing for inmate Robert January, a sex offender, staff psychologist Holloway testified regarding his psychological evaluation.

volved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Id.* at 334–35, 96 S.Ct. at 903.

In this Report and Recommendation, the Court is not applying the *Mathews'* three-part test in a vacuum. The Idaho Supreme Court, in *State v. Wolfe*, 99 Idaho 382, 582 P.2d 728 (1978), held almost sixteen years ago that the Due Process Clause requires an "accurate and fair" JRC recommendation. *Id.* at 388, 582 P.2d at 734. As this Court is mandated to perform an independent review of the due process issue, *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 102 S.Ct. 1148, 71 L.Ed.2d 265 (1982), *Wolfe* is not determinative, but it remains informative.

In proceeding with that independent review, this Court is directed by *Mathews* to examine first the private interests that will be affected by the official action. The JRC report is crucial because it could mean the difference between conditional liberty (probation) and further incarceration. The *Wolfe* decision found that the sentencing judge places "a great deal of trust in this report," and concluded that the rider's interest in a fair and accurate report was "substantial." *Id.* 582 P.2d at 733 (quoting *Childs v. United States Bureau of Parole*, 511 F.2d 1270, 1278 (D.C.Cir.1974)). This Court agrees that the rider's interest in a fair and accurate JRC deliberative process and evaluative report is substantial.

In the present action, the Defendants try to minimize the potential impact of the JRC report by pointing out—accurately—that the sentencing court is not required to follow the report's recommendation and could refuse to grant probation even if the recommendation was favorable. The Defendants cite only two cases where this was done, and provide no statistics showing that sentencing courts regularly ignore JRC recommendations. The Defendants lost this argument almost sixteen years ago in *Wolfe*, and the passage of time has added no greater force to their contention. The Plaintiffs' interest is still substantial.

*Mathews* directs this Court to look next at the risk of an erroneous deprivation by the procedures used, and the probable value of additional or substitute procedural safeguards weighed against the fiscal and administrative burden of these procedures. The risk of erroneous deprivation is further incarceration. To weigh the value of additional safeguards against their burden, the Court will discuss momentarily each proposed safeguard individually. But first, it is helpful to review the Idaho Supreme Court's final conclusion in *Wolfe* concerning what procedures were mandated by due process:

> [c]ertain procedures must be followed. The prisoner must be given adequate notice before the hearing, including notice of the substance of all matters that will be considered. The prisoner must be given an opportunity to explain or rebut any testimony or recommendations. In addition, the prisoner must be free to call witnesses in his behalf from among the employees and other prisoners at NICI. This information should be included in the report sent back to the sentencing judge.

*Id.* at 389, 582 P.2d at 735.

These mandates—basically requiring notice and an opportunity to be heard—are hardly radical, and certainly not arguable. The real issue is how these due process rights are to be transformed into specific working procedures. The Court will now turn to these issues.

## IV. *Written Regulations*

■ As this Court delves into the details, it is confronted immediately with the principal failure of the rider program: The lack of written regulations. There is no uniform treatment of the riders because there is no set of written regulations to guide the program. Some riders received written notice of their right to call witnesses; some did not. Some received staff assistance; some did not.

Without the anchor of written regulations, the program lurches and heaves about, dispensing due process only accidentally. It is incredible that this rudderless ship may have actually reached its destination on occasion: The record indicates—with disputes, of course—that many of the riders were able to present witnesses and a full argument at their rebuttal hearing. There may be factual disputes whether any individual riders were

actually denied due process if the record were to be examined on a case-by-case basis. But this is no way to run a program when an individual's liberty interest hangs in the balance. Due process requires more.

■ The right to due process is the right to be free from arbitrary actions of government officials. *Daniels v. Williams,* 474 U.S. 327, 331, 106 S.Ct. 662, 665, 88 L.Ed.2d 662 (1986). Due process is "such process as may be required to minimize substantially unfair or mistaken deprivation." Tribe, *American Constitutional Law,* § 10–7 at p. 667 (2d ed. 1988). Without written regulations, the NICI program exposed the riders' liberty interest to a high risk of arbitrary deprivation, and thus is constitutionally infirm. *Logan v. Zimmerman Brush Co.,* 455 U.S. 422, 434–35, 102 S.Ct. 1148, 1157, 71 L.Ed.2d 265 (1982) ("A system or procedure that deprives persons of their claims in a random manner . . . necessarily presents an unjustifiably high risk that meritorious claims will be terminated.").

There will undoubtedly be a fiscal and administrative burden on Defendants to produce such regulations, but there is no evidence before the Court that such a burden will be large or costly. Under the *Mathews* balancing test, the value of written regulations far outweighs the associated fiscal and administrative burdens.

What must be contained in these written regulations? The Court will not write them for the Defendants, but instead will provide some firm guidelines based on the requirements of due process. The Court will then order counsel for both sides to meet together and attempt to reach agreement on the actual language of the regulations. The Court will give the following guidelines to be followed in the drafting process:

**A.** *Segregation:*

The Court recognizes its very limited authority to intrude on decisions made by prison authorities for security purposes. *Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). This is especially true where a security issue has not been fully

briefed and argued. The Court will therefore not now disturb NICI's current practice of putting all riders with an adverse tentative recommendation in segregation; that issue will be left to future resolution. *See Balla v. Idaho State Board of Corrections,* 595 F.Supp. 1558 (D.Idaho 1984) *rev'd in part on other grounds,* 869 F.2d 461 (9th Cir.1989) (court did not change practice of segregating inmates, but required staff assistance for those segregated to help prepare for disciplinary hearing).

■ But the segregated rider does not check his due process rights at the door; he is still entitled to notice and a full opportunity to be heard. After this litigation was initiated, the NICI started providing staff assistance to segregated riders to talk with witnesses and assist in the rider's preparation for the hearing. In addition, segregated riders are provided access to a telephone to call their attorneys. The Idaho appeals court found that this assistance fulfills due process requirements, and this Court agrees. *Bradford v. State,* 124 Idaho 788, 864 P.2d 626 (Ct.App.1993).

If staff assistance is unavailable, NICI must use some other means to ensure that a segregated rider can contact witnesses. The United States Supreme Court has held that where an inmate has a constitutional right to call witnesses as the riders do here, prison officials have the burden of proving that a legitimate penological reason justifies a denial of that right. *Ponte v. Real,* 471 U.S. 491, 497, 105 S.Ct. 2192, 2196, 85 L.Ed.2d 553 (1985). This Court agrees with the Idaho Court of Appeals that the rider does not have a due process right to *personally* contact the witnesses. *Bradford* at 791, 864 P.2d at 629. There is no evidence before the Court that contact by writing would jeopardize security. The NICI must provide some means set forth in the regulations to protect the rider's right to call witnesses.[3]

The NICI must make staff available if the rider requests them as a witness. If there is a problem because the hearing is set on the staff person's day off, the hearing could be

---

**3.** The term "witnesses" includes other inmates and staff, but does not include those outside the

NICI. It will be the rider's obligation to arrange for their presence without NICI assistance.

moved to a later time as an accommodation so long as it does not interfere with the rider's preparation.

On the other hand, the rider is not entitled to undue cumulative or irrelevant testimony. The Supreme Court has held that the Due Process Clause leaves to the decision-maker the discretion to put reasonable limits on cross-examination and the presentation of witnesses. *Goss v. Lopez,* 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975). The rider will be required to abide by a rule that allows him to request a witness by summarizing in writing that witness's testimony. The same rule will give the JRC the authority to refuse to hear irrelevant or unduly cumulative testimony so long as the JRC's reasons are provided to the rider. *See Ponte v. Real,* 471 U.S. 491, 105 S.Ct. 2192, 85 L.Ed.2d 553 (1985) (while due process requires jail officials to state reasons for refusing to call a witness at inmate's disciplinary hearing, those reasons may be given orally and need not be in writing).

**B.  *Notice of Right to Call Witnesses:***

■ The form that first notifies the rider of the JRC's tentative recommendation must include a written notice that the rider has a right to call witnesses on his behalf at the rebuttal hearing.[4]

**C.  *Right to Materials Relied on by JRC:***

■ The United States Supreme Court has held that the due process clause requires "full access to all information relied upon by the state agency ... [thereby] enabling [the inmate] to challenge directly the accuracy of information in his file as well as the correctness of the agency's tentative conclusions." *Mathews,* 424 U.S. at 346, 96 S.Ct. at 908. In addition, the Idaho Supreme Court has held that the rider program must provide the rider with a meaningful opportunity "to explain or rebut any testimony or recommendations." *Wolfe* at 389, 582 P.2d at 735. Based on these authorities, the Court finds that the written regulations must include a provision that the rider is entitled to a copy of all materials that come before the JRC. This will include copies of the staff evaluations or chronological reports, as well as the full psychiatric evaluation completed on sex offenders or others. The Court recognizes, as argued by defendants, that the sex offender being counseled by a psychologist is not normally provided with a copy of the psychological evaluation. But here, it is clear from the record that the psychological evaluation is crucial to a determination of the rider's liberty interest, and thus the rider is entitled under the circumstances of this case to a copy of the psychological evaluation that is being reviewed by the JRC.

The Defendants have noted that the riders now have the opportunity to call the psychologist as a witness, and the Court will order that this right be contained in the written regulations.

**D.  *Training of NICI Staff:***

Although the procedure for recording staff evaluations has changed over the years, the crucial nature of those evaluations remains. The record indicates that officers are trained at the Correctional Academy before they begin work, and that once on the job, they can refer to a written manual that sets evaluation standards. These facts, in combination with a regular review of staff evaluations by supervisors, should ensure that the evaluations are of high quality. With this guidance the Court will leave the details of any training requirements that would appear in the written regulations to the agreement of counsel.

**E.  *JRC Deliberative Process:***

In *Bradford v. State, supra,* the Idaho Court of Appeals held that "where the [JRC] relied upon secret information from a confidential source whom the inmate was not allowed to confront or rebut, the inmate's due process rights were violated." *Id.* at 792, 864 P.2d at 630. Now-retired United States Supreme Court Justice Byron White has written that "the right to an impartial decisionmaker is required by due process" in every case. *Arnett v. Kennedy,* 416 U.S. 134,

---

**4.** Shortly before the Complaint was filed, NICI revised Form 022 to specifically include a notice to the rider that he could call witnesses at the hearing. *See* Exhibit B-24, Appendix to Plaintiff's Brief. Attorneys for the Plaintiffs have suggested that this addition to the form was at their insistence.

197, 94 S.Ct. 1633, 1665, 40 L.Ed.2d 15 (1974). Professor Laurence H. Tribe—a leading constitutional scholar—summarized the caselaw as follows: "The Supreme Court has placed enormous weight on the *neutrality* of due process hearings." Tribe, *supra* § 10–16 at p. 744. (Emphasis in original).

■ These legal authorities can be translated into written regulations governing the JRC deliberative process in two ways: (1) the written regulations must contain a prohibition against all ex-parte contact with the JRC; and (2) the written regulations must contain detailed guidelines for determining when a JRC member should sit on a particular case. For example, the regulations must provide that any JRC member who has been a counselor for a rider—or had some other similar relationship—will not sit on that rider's JRC hearing. In addition the regulations shall state the importance of avoiding even the *appearance* of impartiality. *See Morrissey v. Brewer,* 408 U.S. 471, 485–86, 92 S.Ct. 2593, 2602–03, 33 L.Ed.2d 484 (1972) (holding that parole hearing officer should be disqualified for close relationship with parolee even when no actual bias was shown).

The Court does not agree with Plaintiffs' suggestion that outside administrative law judges hear these matters. The Court is confident that with the written regulations governing disqualification and the prohibition of ex-parte contact, the NICI can provide impartial hearing officers from within the NICI. *See Wolff v. McDonnell,* 418 U.S. 539, 571, 94 S.Ct. 2963, 2982, 41 L.Ed.2d 935 (1974) (holding that inmate disciplinary committee composed of staff members was sufficiently impartial because it was guided by written regulations and did not have unlimited discretion).

### F. *Time to Prepare:*

■ The Defendants are now giving the inmates ninety-six hours to prepare for their rebuttal hearing. In the past—even under the best scenario—most riders were given about twenty-four hours to prepare. It appears that the present ninety-six hour preparation time is dependent on a transportation schedule that could change at any time. There must be a written regulation specifi-

cally setting a minimum amount of time for the rider to prepare for his rebuttal hearing.

In this regard, it is important to recognize the broad range of the hearing. The hearing is not limited to a single incident as a typical disciplinary hearing would be. Instead, the rider's past record along with his performance in the last three or so months at the NICI is under scrutiny. There may also be a psychological report that is broad and complex.

This case is therefore distinguishable from *Wolff v. McDonnell, supra,* where the Supreme Court held that a prisoner facing disciplinary charges must be given "no less than 24 hours" notice. In *Wolff,* the inmates were faced with a disciplinary hearing that focused on a single incident. Here, however, a rider is facing a hearing that will cover much more ground. It would therefore appear that something more than twenty-four hours is required here. The defendants have not asserted that any fiscal or administrative burden would be caused by giving the rider more time.

With this guidance, the Court shall leave the precise amount of time to the agreement of counsel.

### V. *Declaratory Judgment*

In addition to seeking written regulations, Plaintiffs also seek a declaration that other failures of Defendants violated the Due Process Clause. The Plaintiffs explain in their briefing that they are making a "facial attack on Defendants' system" and are not asking the Court "to determine that any particular rider suffered constitutional injury." Plaintiffs' Brief at p. 12.

In their "facial attack," Plaintiffs are asking the Court "to hold that Defendants' procedures are constitutionally infirm on their face because they create an unacceptably high risk that some riders will suffer such injury." *Id.* In other words, Plaintiffs want this Court to declare that past NICI practices violate due process not because any one of the 400 or so riders in the class suffered an actual deprivation, but instead because the riders—as a group—were exposed to a "high risk" of deprivation.

At first glance, Plaintiffs' request would appear to be objectionable on justiciability grounds. Federal courts normally require a showing of actual injury; simply being exposed to a "high risk" of injury is insufficient. But in due process analysis, the Supreme Court has held that actual injury is not required: It is enough that a liberty interest is exposed to a high risk of deprivation. *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865 (1950); *Carey v. Piphus*, 435 U.S. 247, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978); *Logan v. Zimmerman Brush Co., supra.*

The Court does want it clearly understood that it is not recommending a holding that any individual rider suffered an actual due process deprivation. The Plaintiffs have not sought such a finding in this lawsuit, and the proper vehicle for individual determinations is a suit for post-conviction relief in state court under Idaho Code § 19–4901. *See Bradford v. State, supra.*[5] Instead, the Court is here merely recommending a finding that certain procedures used in the rider program exposed riders—as a group—to a high risk that their liberty interest in a fair process would be deprived.

In its discussion of the content of the written regulations, *supra* at IV, the Court has identified the risky procedures and cited authority for their constitutional infirmities. In this summary judgment proceeding, the Court can only recommend enjoining those past practices that are undisputed; summary judgment cannot extend to those practices in dispute. The Court will therefore recommend confining a declaratory judgment to undisputed practices.

In addition, many of the undisputed practices have ceased. Nevertheless, injunctive relief is still appropriate where—as here—there is nothing (such as written regulations) to prevent the State from reverting to old practices. *See United States v. Oregon State Medical Society*, 343 U.S. 326, 72 S.Ct. 690, 96 L.Ed. 978 (1952).

While NICI has made substantial progress in changing its practice shortly before and during the pendency of this litigation, the Court would recommend a declaratory judgment that the following procedures were unconstitutional and hence enjoined:

1. Failing to notify the rider in writing, prior to April 1991, on the Form 022 or its equivalent of the rider's right to present witnesses at his rebuttal hearing.

2. Failing to provide copies of the staff evaluations to riders.

3. Failing to provide sex offender or other riders with a copy of their psychological report.

4. Failing to provide a means for segregated riders to prepare for the rebuttal hearing, i.e., providing staff assistance to contact witnesses, access to a telephone to contact legal counsel.

5. Failing to give segregated riders more than twenty-four hours to prepare for the rebuttal hearing.

### *Quasi–Judicial Immunity:*

■ The Defendants assert in their briefing that they are absolutely immune because they enjoy quasi-judicial immunity. Judicial immunity is an immunity from damages; it is not an immunity from declaratory or injunctive relief. *Pulliam v. Allen*, 466 U.S. 522, 104 S.Ct. 1970, 80 L.Ed.2d 565 (1984). Thus, the Doctrine of Judicial Immunity has no application to Plaintiffs' Motion for Summary Judgment which seeks no damages.

### IV. *SUMMARY*

In summary, the Court would recommend that the Plaintiffs' Motion for Summary Judgment be granted in part and denied in part. The Court would recommend that the motion be granted to the extent that it seeks a ruling that the Defendants must provide written regulations governing the operation of the rider program. The Court would recommend that the Defendants be given sixty days to produce written regulations that comply with the statements made earlier in

---

**5.** As *Bradford* explains, the rider must show prejudice to be entitled to relief under Idaho Code § 19–4901. In other words, he must show not only that he was deprived of due process, but that it made a difference in the outcome of his hearing. *Id.* at 792, 864 P.2d at 630.

this opinion. The Court would further recommend that counsel for both parties meet during this sixty-day period and attempt to reach an agreement on the contents of the regulations. The Court would further recommend that at the end of the sixty-day period, the parties submit to the Court a set of the agreed-upon written regulations for approval.

The Court also recommends that the Plaintiffs' motion seeking a declaratory judgment that past practices of the NICI violate due process, and seeking also to enjoin those practices, be granted in part and denied in part. The motion should be granted as to the following five practices, and denied as to the remainder:

1. Failing to notify the rider in writing, prior to April 1991, on the Form 022 or its equivalent of the rider's right to present witnesses at his rebuttal hearing.

2. Failing to provide copies of the staff evaluations to riders.

3. Failing to provide sex offender or other riders with a copy of their psychological report.

4. Failing to provide a means for segregated riders to prepare for the rebuttal hearing, i.e., providing staff assistance to contact witnesses, access to a telephone to contact legal counsel.

5. Failing to give segregated riders more than twenty-four hours to prepare for the rebuttal hearing.